[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Bruce Meyers, owns two residential dwellings located at 25 Fenwick Court and 21 Raul Court in the Town of Groton. The 25 Fenwick Court property is in an open space subdivision in the RU-20 zone. The 21 Raul Court property is in the RS-12 Zone. Single family homes are permitted in both zones. Rooming or boarding houses are not allowed in either location. Meyers has not lived at either of the properties.
For some years, Meyers used both properties to lodge men who have had substance abuse histories but who are trying to right their lives. Up to six, but no more than six, such men stay at each of the properties. The men are not related by blood, marriage, or adoption. The several men who stay at each property CT Page 6267 do not comprise what is ordinarily known as a "family."
The Groton zoning enforcement officer investigated the use of the Meyers' properties vis-a-vis the zoning regulations.
The zoning enforcement officer concluded "the houses at 25 Fenwick Court and 21 Raul Court comply with the Town of Groton Zoning Regulations." Memorandum dated May 22, 1995, from Mark N. Tebbets, Building/Zoning Official, to Mark Oefinger, Manager of Planning and Development. Record Item No. 14.
Within days, the defendant, Theresa Tabor, appealed to the defendant zoning board of appeals seeking a review and reversal of the zoning enforcement officer's decision. In her appeal to the defendant Zoning Board of Appeals, Tabor requested the Board to "OVERTURN THE DECISION OF THE ZONING OFFICIAL THAT HAS ALLOWED GROUP HOMES/3/4 HOUSES/1/2 WAY HOUSES TO OPERATE IN A RESIDENTIAL ZONE." Application dated May 26, 1995. Record Item No. 1.
A public hearing by the Zoning Board of Appeals was scheduled for July 12, 1995. The public notice described the purpose of the hearing:
 "Theresa Tabor, applicant; to appeal a decision of the Zoning Official that allowed group homes/3/4 hours [Sic]/1/2 way houses to operate in a residential zone." Certificate of Legal Notice, Record Item No. 2.
The public hearing on Theresa Tabor's appeal was held on July 12, 1995. There was extensive public opposition to Meyers' use of the properties.
On July 12, 1995, the defendant zoning board of appeals made its decision. The minutes of the defendant board state:
 "#95-15 — 25 Fenwick Court and 21 Raul Court (Meyers/Tabor).
"The Chair requested discussion from each Board member.
"MOTION: To uphold the decision of the Zoning Official.
 "Motion made by T. Manning, seconded by R. Fitzgerald. Motion did not carry, 0 votes in favor, 5 opposed. DECISION OVERTURNED, because testimony presented CT Page 6268 indicates the two houses fall under the definition of rooming/boarding houses, and that such use is not permitted in an RS zone (21 Raul Court), nor in an open space subdivision (25 Fenwick Court is in the Woodcrest Subdivision, an open space subdivision) in the RU-20 zone." Minutes of Meeting held on July 12, 1995, p. unnumbered p. 4. Record Item No. 5.
Although authorized by the regulation, § 8.5-8, to do so, the board did not make or enter any other order regarding the Meyers' properties.
This timely appeal pursuant to C.G.S. § 8-8 followed.
AGGRIEVEMENT
The plaintiffs bear the burden of showing aggrievement. C.G.S. § 8-8(b). Aggrievement may be established by "facts established in the record as a whole, including the administrative record." State Library v. Freedom of InformationCommission, 240 Conn. 824, 832 (May 13, 1997).
There is no evidence before the court, i.e., "in the record as a whole, including the administrative record," that the plaintiff, Linda Meyers, had an ownership interest, or any other interest, in either of the properties. There is nothing before the court which would support a finding of aggrievement. The court holds that the plaintiff, Linda Meyers, is not aggrieved.
The plaintiff, Bruce Meyers, owns the properties which were the subject of the action of the Zoning Board of Appeals. Transcript of Court Proceedings, 12/5/1996, p. 32. Ordinarily, this would make him aggrieved.
The administrative record, at first glance, may show a lack of aggrievement.
The Groton zoning regulations provide in part that "the affirmative vote of four members shall be necessary to reverse or modify the order, requirement, or decision appealed from." Zoning Regulations, Section 8 Administration and Enforcement, § 8.5-8, p. 8-27-28.
On July 12, 1995, the defendant zoning board of appeals made its decision. The minutes of the defendant board state: CT Page 6269
"MOTION: To uphold the decision of the Zoning Official.
 "Motion made by T. Manning, seconded by R. Fitzgerald. Motion did not carry, 0 votes in favor, 5 opposed. DECISION OVERTURNED, because testimony presented indicates the two houses fall under the definition of rooming/boarding houses, and that such use is not permitted in an RS zone (21 Raul Court), nor in an open space subdivision (25 Fenwick Court is in the Woodcrest Subdivision, an open space subdivision) in the RU-20 zone." Minutes of Meeting held on July 12, 1995, p. unnumbered p. 4.
Because of the form of the motion, the vote taken by the board on this matter was not "an affirmative vote of four members . . . necessary to reverse . . . [the zoning enforcement officer's] decision appealed from." The board's vote on the question did not have the effect of overruling the decision of the zoning enforcement officer.
But, the board determined the plaintiff's properties are "boarding/rooming houses," uses not permitted where these houses are located. Although neither the board nor the zoning enforcement officer has issued a cease and desist order or the like, that could come at any time. The board's July 12, 1995 finding that the houses were "boarding/rooming houses" remains binding on the plaintiff. At any subsequent proceeding, the board and the plaintiff would be bound by the July 12, 1995 decision. That decision cannot be changed.
 . . . prior administrative decision may not be reversed by the commission unless there has been a change of circumstances." T. Tondro, Connecticut Land Use Regulation (2d ED. 1992), § 8.2, p. 597.
The Appellate Court recently stated:
 ". . . the law of this jurisdiction is that a board cannot reverse its previous decision unless the facts and circumstances that actuated the decision are shown to have so changed as to vitiate or materially to affect the reason that produced and supported the decision. This rule has been applied in the context of successive applications or appeals to a board. See CT Page 6270 Grillo v. Zoning Board of Appeals, 206 Conn. 362, 367, 537 A.2d 1030 (1988)." Sharp v. Zoning Board of Appeals, 43 Conn. App. 512, 522 (November 12, 1996).
Plaintiff does not get another opportunity to present evidence or further evidence of the use of the houses before July 12, 1995. He does not get the opportunity to have the board reexamine its July 12, 1995 decision.
The July 12, 1995 decision of the zoning board of appeals, as a practical matter, has a lasting effect harmful to the plaintiff's interest(s).
 "`Aggrievement is established if there is some possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected.'" State Library v. Freedom of Information Commission, 240 Conn. 824, 834 (May 13, 1997).
Plaintiff, Bruce Meyers, is aggrieved by the July 12, 1995 action of the defendant zoning board of appeals.
DISCUSSION
In his appeal, plaintiff specifically complains:
 "The Board erroneously concluded that the Plaintiffs' use of their property constituted a boarding house when in fact the Plaintiffs' use was in conformity with the Town's definition of a family." Complaint, August 2, 1995, ¶ 7(d). [1??].
The Appeal states that board found the properties "constituted a `boarding' house." The court treats this as a clerical error; the appeal should have used the term "boarding/rooming house" as that was the term used in the board's resolution. The differentiating factor between boarding and rooming houses is that the boarding house furnishes meals to its occupants. 40 Am.Jur.2d, Hotels, Motels, Etc., § 6, p. 904. It is clear that Meyers did not furnish meals. The court treats the Board's finding as a finding that the Meyers houses were "rooming houses."
The plaintiff states: "The entire controversy lies in the CT Page 6271 application of the definitions `One Family Dwelling' and `Rooming and Boarding House.'" Brief of the Plaintiff Bruce Meyers, March 20, 1995, p. 4.
Two provisions of the Groton zoning regulations lie at the heart of the controversy. They are:
 "FAMILY: Any number of individuals related by blood, marriage, or adoption, living together as a single housekeeping unit. A group of not more than four persons keeping house together, but not necessarily related by blood or marriage, may also be considered a family." Zoning Regulations, Section 2 Definitions, p. 2-4.
 "ROOMING AND BOARDING HOUSE: Any dwelling in which at least three persons but less than 12 persons are housed or lodged for hire or otherwise without separate kitchen facilities, with or without meals. If 12 or more persons are housed or lodged, such building shall be considered a hotel or motel." Zoning Regulations, Section 2 Definitions, p. 2-11.
The board decided "the two houses fall under the definition of rooming/boarding houses." Minutes of Meeting held on July 12, 1995, p. unnumbered p. 4. Record Item No. 5.
Our Supreme Court has defined the role of the trial court where the ZBA has stated the reason(s) for its decision.
 "`Where a zoning agency has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . The [decision] must be sustained if even one of the stated reasons is sufficient to support it. . . . [This] applies where the agency has rendered a formal, official, collective statement of reasons for its action.' (Citations omitted; internal quotation marks omitted.) Protect Hamden/North Haven from Excessive Traffic Pollution, Inc. v. Planning Zoning Commission, 220 Conn. 527, 544, 600 A.2d 757 (1991)." Bloom v. Zoning Board of Appeals of the City of Norwalk, 233 Conn. 198, 208
CT Page 6272 (1995).
The board gave the reason for its decision, — "the two houses fall under the definition of rooming/boarding houses." Therefore, the court's role is limited. It must review the record (1) to "determine only whether the assigned grounds ["the two houses fall under the definition of rooming/boarding houses"] are reasonably supported by the record" and (2) "whether they [the assigned grounds] are pertinent to the considerations which the authority was required to apply under the zoning regulations."
Each of the Meyers' houses is a dwelling. Three but less than 12 persons are housed or lodged in each. The "lodging" element is satisfied. Each occupant pays for his lodging. Thus, the "for hire" element is present. There is only one kitchen facility in each house. The "without separate kitchen facilities" element is satisfied. Each of the Meyers' properties comes within theliteral definition of "boarding/rooming house" contained in the regulations. Further indication of what is meant by "rooming house" is the regulations' defining the same as a hotel but for the number of persons housed or lodged.
Plaintiff, at least tacitly, agrees the Meyers' properties come within the literal definition of "rooming house" as stated in the regulations. Brief of The Plaintiff Bruce Meyers, March 20, 1996, pp. 8, 10 — 12.
The inquiry need not end with a determination that the houses fall within the literal definition in the regulations. Other sources show the common understanding of "rooming house." A "rooming house" is "a house where rooms are provided and let." Webster's Third New International Dictionary. "Let" means "rent, lease." Id.
The regulations of the issued by the Connecticut Department of Housing in connection with the Chapter 138b of the General Statutes, "Housing Programs for Homeless Persons," contain the definition —
 "`Rooming House' means a building in which separate sleeping rooms are rented providing sleeping accommodations for more than three persons, on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants." Conn. Dept. Regs. § 8-358-1(k). CT Page 6273
The chapter of the Connecticut Fire Safety Code entitled "Lodging and Rooming Houses" states:
 "This chapter applies to buildings that provide sleeping accommodations for a total of 16 or fewer persons on either a transient or permanent basis, with or without meals, but without separate cooking facilities for individual occupants except as provided in Chapter 21."
The Meyers houses come within both of these regulatory definitions.
Abundant evidence was submitted to the board regarding the use and operation of the Meyers' properties. Meyers was the source of much of the information and material. A description of and excerpts from these materials are set forth below.
1.
Meyers had a promotional brochure about 25 Fenwick Court, Mystic. A picture of a raised ranch house, presumably the house at 25 Fenwick Court, was featured on its first page. Printed above the picture is what appears to be Meyers' name for the facility:
TRANSITION HOUSE
3/4 WAY HOUSE WITH SUPPORT PROGRAM
Also on that page below the picture, was the following:
 Offering a residential program for men in the process of making a transition to healthier living.
 Transition House of Mystic 25 Fenwick Court Mystic, CT 06355 Phone: (203) 464-6973 business (203) 536-7954 residence
Business Address: CT Page 6274
 BRUCE A. MEYERS, M.A. 24 Washington Drive Gales Ferry, CT 06335
A mini-sketch of Mr. Meyers makes up another page:
ABOUT MR. MEYERS:
 A graduate from Tufts University, he has worked for the past five years in the field of addiction and recovery. He completed advanced programs and courses in addictions at the University of Connecticut, CADAC and the New England Institute of Alcohol Studies. Since 1981 he has maintained a private clinical practice for individuals and families in Gales Ferry, Connecticut. Originally trained as a counselor and teacher, he was employed for 18 years in education both in New England and overseas with the U.S. Department of Defense. Mr. Meyers lives with his family in Ledyard, Connecticut. He has dedicated his life to helping those in need.
INFORMATION AND/OR ADMISSION CALL OR WRITE TO:
 Bruce A. Meyers, Director Transition House of Mystic 25 Fenwick Court Mystic, CT 06355 (860) 464-6973 (860) 536-7954
Another page outlines admission requirements for Transition House:
ADMISSION REQUIREMENTS:
— Recent medical check-up by a physician.
— Employment or active volunteer work.
— Active participation in bi-weekly family meetings. CT Page 6275
 — Demonstrative commitment to building and maintaining supportive relationships.
 — Productive involvement in either a weekly individual counseling session or a support group of your choice.
 — Conformity to the general rule of fairness and consideration for others.
 — Commitment to being drug free, a four month period of abstinence is required prior to admission.
— One week security deposit.
— On time payment of program and house fees.
Another page contained the following:
TRANSITION HOUSE:
 A residence for men who are committed to their personal recovery from:
 Any Addiction Stressful Situations Emotional Difficulty
 Most residents should anticipate a stay of somewhere between four weeks to one year.
 We are committed to living together in a way which is both mutually considerate and supportive.
Independence and self-sufficiency are encouraged.
 Residents are expected to build and maintain close relationships with:
 Other residents Family Members The Community
Another page stated: CT Page 6276
SETTING:
 A quiet, family-oriented residential neighborhood located just off exit 89 of Interstate I-95 in Mystic, Connecticut.
FACILITY:
 Facility offers a completely furnished modified raised ranch home with private and individually controlled heated rooms. Comfortable common areas, laundry facilities, Cable TV and a private yard.
TRANSPORTATION:
 Public bus service nearby and local taxi service. A car is available for car pooling in exchange for agreed upon house labor.
 Brochure About Mr. Meyers [Transition House], Record Item No. 30(f).
2.
Meyers prescribed rules and regulations of conduct for the occupants. Each occupant signed a contract to abide by same. The rules, regulations, and the contract containing same were in evidence.
TRANSITION HOUSE RULES REQUIREMENTS
 1. BASIC RULE: Consideration and courteous behavior is expected at all times.
 — Clean up after yourself in the common areas. — No fighting or threatening of any resident.
— Keep noise levels appropriate to time and place. — Inform the house if you are traveling or are staying overnight somewhere. — Daily checking of ones assigned area to keep it clean. — Turn back heat and shut off lights when last to go to bed, last to leave the house or leaving your room. CT Page 6277
2. SAFETY HEALTH RULES:
 — No smoking in your bedroom. — Cover and refrigerate all food. Wipe table, counter tops and stove after each use.
3. RECOVERY REQUIREMENTS:
 — Mandatory attendance at weekly house meetings with other residents. — Active participation in our house and 12-step meetings. — Find and maintain an appropriate 12-step AA/NA sponsor as well as a home group. — Attend and participate in at least three AA, NA, GA or OA meetings a week. — No use of drugs other than those prescribed by a physician or psychiatrist.
— Find and maintain full time employment.
4. SPECIAL HOUSE RULES:
 — GAMBLING — No gambling at the casino, track or within the house.
 — DRUGGING — Any known or suspected inappropriate drug use is to be reported.
 — GUESTS — You are totally responsible for the behavior of your guests. No one who has recently used drugs may be brought into the home. They are not to be left alone or permitted to stay longer than three days without permission. Guests may stay overnight only if other residents have been asked and have no objection.
 — TELEPHONE/TV — A two dollar a week charge is added to your bill to pay for direct dial local phone service and a premium cable channel. You may obtain fire and emergency rescue service by dialing 911. While an operator can not be reached from this phone, long distance calls are possible using your CT Page 6278 own calling card.
 — HOUSE DEPOSIT — A house deposit, required at the time of admission, allows residents to have a grace period of one week should you have financial problems. In the event of non-payment of weekly rent and fees beyond this grace period, assistance will be given to you in making other living arrangements at a home or a no fee shelter. Your room will then be held open for you to return at no charge for seven days.
 — RENT-FEES — Transition House operates as a family who share certain living expenses, agree to certain rules, requirements and commitments to each other. To support and make possible our common recovery effort, rent and fees are required to cover our costs. Timely payment (Friday or Saturday) of these charges is expected. Should you not be able to pay your charges in full for whatever reason, it is your responsibility to contact me before it is due.
 — TERMINATION — Continued breaking of house rules and disregard for our requirements will lead to dismissal from our house. A violation of one of our three cardinal rules (rules printed in bold print) is grounds for immediate termination of your right to live with us and the house deposit will not be returned. Refusal to participate in a drug screen when requested is also cause for termination. A one week notice of a decision by you to leave our house is expected. Personal items left longer than two weeks will be given to those in need. Residents who have left Transition House are encouraged to maintain contact with us provided of course that they continue to remain drug free.
 RULES THAT APPLY TO RESIDENTS ON PROBATIONARY STATUS:
CT Page 6279
(All new residents and those placed into this status)
1. Overnights are not permitted for 30 days without express permission.
2. A record is to be kept of all AA/NA meetings. (14 days.)
I HAVE READ, UNDERSTAND, AND AGREE TO ABIDE FULLY BY THE RULES AND REGULATIONS OF TRANSITION HOUSE.
X ____________________________
4.
Apparently after an incident involving a Transition House occupant, Meyers wrote to the neighbors.
March 15, 1995
Dear Neighbors,
Recently you may have read or heard about an anonymous flyer which referenced two homes that I own. I want to provide you with some accurate information. These are not Half-Way Houses but they are clean sober houses and all family members have had to demonstrate a desire to live without drugs. They do this by being able to show four things. First, they have completed an intensive treatment program of 28 days or more. Second, they must show that by using their knowledge of either the NA or AA recovery program, they have put together at least three months of sobriety in their recent past. Third, they must grant me access to confidential treatment records and have positive recommendations from their treatment counselor. Lastly, they must successfully pass a house interview. No one is allowed to join a home who is on parole or has any pending legal issues.
Every resident is expected to make a contribution to the running of the house i.e. cooking together, paying expenses, sharing of common chores and maintaining the appearance of the house. Each member is expected to work a regular forty hour week and at the same time maintain an active 12-step program. Any resident who uses drugs or even has contact with those who do is immediately removed. CT Page 6280
To date, this process has worked extremely well. In two years many residents have been able to return to a "normal" life. Families have been reunited and old wounds healed. Recently, however, our screening process was compromised. Some highly significant information was held from us by a Hartford based treatment center. Additionally, this man's probation officer neglected to communicate his prior conviction to us. When this situation came to light, we first sought verification, then our residents provided continuous security until we were able to make arrangements for a safe and prompt transfer on Wednesday.
All of us have been both shocked and angered by this. Our residents are no exception. Our goal, which is to both recover in a safe place and to develop positive relationships with our house family and neighbors, has been hurt. To prevent any future occurrences of this, anyone coming to us who is on probation will have their probation officer contacted at the pre-screening stage.
Most of the neighbors who called me Monday night recognized the need and value of safe and sober homes. Unfortunately, treatment by itself does not bring about recovery. Safe and sober homes make the seemingly impossible, possible.
Our families at 21 Raul Court and 25 Fenwick Court have united themselves in this common cause. Drugs once destroyed their lives and quite literally took everything. Now they are determined to live clean and sober. I invite you to meet Loui, our 24 hour house "Mom." Ask him or any of the other residents whatever any question you would like. To ask questions or visit these homes just call me at 464-6973. If you have any concerns we need to hear from you.
One page letter, "Dear Neighbors," dated March 15, 1995,
Record Item No. 30(g).
5.
A memorandum regarding the Planning Director's conversation with Mr. Meyers on March 30, 1995 was also in evidence.
 As a follow-up to our discussion yesterday, I spoke to Mr. Meyers in a telephone conversation yesterday afternoon. The following are his responses to the questions you asked CT Page 6281 me to pose.
 What are the program fees?
 Mr. Meyers told me that the program fees are $72, $77 or $87 per week, per person, depending upon which bedroom they stay in. He said he collects these fees on a weekly basis but will accept and prefers one month's fee at a time if the resident can afford it. He described the program fee as covering rent, including a share of cable television and telephone fees. It also covers the cost of being in his program which he described as "the guys supporting each other," rides if needed, and participation in the 12-steps for recovery program.
 A quick check of local real estate ads indicates that rent for homes comparable to these might be $1,000 a month plus utilities.
 What is the role of the House Supervisor?
 Mr. Meyers stated that the House Supervisor helps new people entering the program. He helps them find the meetings required by the 12-step program. He voluntarily provides rides to meetings. He collects the program fees for Mr. Meyers. He enforces the house rules and he can ask someone to leave the house if they are not abiding by the rules. I did ask Mr. Meyers to send us a copy of the house rules and the contract each resident enters into. I will forward these to you as soon as I receive them.
 What is Mr. Meyers role at the weekly "family meetings?"
 Mr. Meyers said he sits in on the meeting because he likes to know what is going on at the house. He did note that he is not always there and the meeting takes place whether he is there or not. The meeting format is a group dialogue. In response to my question asking does he act as a facilitator at these meetings, Mr. Meyers answered that if he is present he does act as a facilitator.
 I hope the above information proves useful to you. Mr. Meyers did note to me that his attorney is Tom Londregan. Please feel free to call me at 441-6610 if you have any questions. Thank you. CT Page 6282
 Memorandum from James S. Butler to Hinda Kimmel, Town Attorney's Office, 31 March 1995, Return of Record, Item No. 8.
* * *
Meyers told town officials he visited each house at least four days a week. Memorandum, James S. Butler, Director of Planning, to James F. Brennan, Town Attorney, March 17, 1995, p. 1. Return of Record, Item 7.
"The telephones at both locations are listed in the white pages under his [Meyers'] name." Letter, James F. Brennan, Town Attorney, to James S. Butler, Planning Director, May 1, 1995, p. 1. Return of Record, Item 11.
The defendant zoning board of appeals had the five items set forth in detail above and the information about Meyers' visits and telephone listings. This information is quite revealing. From this information alone, the Board could conclude, perhaps would be compelled to conclude, much about the operation of the Meyers' houses.
Meyers sought individuals to stay at his houses. He screened applicants even requiring them "to grant [him] access to confidential treatment records." Meyers determined who could stay at his houses. He required each applicant to sign a contract with him. The occupants had to live by the rules and regulations which he made up.
Meyers had a "house supervisor" or "house mom" on the premises. He collected the money Meyers charged the occupants. That person enforced the rules, etc. The house supervisor could "ask someone to leave if they were not abiding by the rules."
Meyers charged "$72, $77, or $87 per week, per person depending upon which bedroom they stay in." A prime factor in determining the amount an occupant paid for his lodging was the bedroom in which he stayed. The amount charged was a weekly charge. Although Meyers preferred to be paid in advance for a month, the money was due weekly, i.e., each Friday or Saturday.
The stay of each individual was short term. According to Meyers, the normal minimum stay was four weeks and the longest CT Page 6283 perhaps one year. There was a relatively frequent or rapid turnover of occupants. The occupants did not have a telephone listing in any of their names. The telephone listing was in Meyers' name alone. Meyers visited each house at least four times a week.
From the materials and information before it, the board readily could conclude the dominant relationships here were those between the property owner, Meyers, and each individual staying at the houses. This evidence hardly would support a finding that any group entity comprised of the persons living at each house even existed much less had an ongoing definitive role at either house. This evidence showed Meyers had not rented either house premises as a whole to a group entity.
There are sufficient indications that the Meyers's houses comport with common understandings of what constitutes a "rooming house."
All of the evidence set forth and discussed above was part of the record before the defendant board. It also should have been and probably was available to the zoning enforcement officer when he made his May 22, 1995 decision that the Meyers' properties "comply with the Groton Zoning Regulations."
At the July 12, 1995 public hearing, further evidence was taken. Evidence was introduced in the form of a letter from the local fire marshal to the effect that his office had classified the Meyers' houses as "rooming houses." The relevant part states:
 "Information that we have obtained about the number of residents and lease and/or rental arrangements of these properties has led us to the conclusion that these buildings shall be classified a Rooming Lodging under the Connecticut Fire Safety Code. For the purposes of this code, they can no longer be considered Single or Two Family Residences. We have addressed our findings with the State Office of Public Safety, Division of Fire, Emergency and Building Services, Bureau of Engineering and they confirm our classification." Letter, Deputy Fire Marshal William A. Wells, The Old Mystic Fire District, to Mark Oefinger, Manager of Planning and Development Services, July 10, 1995. Return of Record, Item # 30(e). CT Page 6284
A chart was put in evidence. It purported to show a comparison of various attributes of the Meyers' houses and rooming houses in Groton. It demonstrated similarities of the Meyers' houses to rooming houses. See Comparison Chart Between Meyers' Properties and Rooming and Boarding Houses, Record Item No. 30(b).
The defendant here, Theresa Tabor, testified. She stated that Mr. Meyers —
 "told [her] that he wanted to see my basement because he was thinking about putting rooms in and renting out rooms to people, I believe it was back in 1993, the summer of 1993." Transcripts of July 12, 1995 ZBA Proceedings, p. 15.
Mark Tebbetts was the zoning enforcement officer. He was questioned about his investigation upon which he based his decision that the Meyers' properties "comply with the Town of Groton Zoning Regulations." His testimony is set forth below:
Rannenberg: Regarding the Fire Marshal's letter just read, under the State Fire Safety Code, 21 Raul Court and 25 Fenwick Court are classified as Rooming and Lodging Houses. Did you consider this when you issued your May 22, 1995 ruling?
Tebbets: No I did not.
Rannenberg: Should you have considered this fact prior to your ruling?
 Tebbets: It certainly makes a good point and I would have to at this point, consider it.
Rannenberg: Next question. Does the Town of Groton Building Code make the distinction between a rooming and boarding house and a single family dwelling? If yes, what is it?
Tebbets: Yes it does. It determines again, number of people in the house and how the living circumstances and what are their transience.
Rannenberg: Did you consider this when you issued your May 22, CT Page 6285 1995 ruling?
Tebbets: Not on making my Zoning Regulation call, no.
Rannenberg: Should you have considered this information prior to your ruling?
Tebbets: I think I should.
Rannenberg: Thank you.
Tabor: Teresa Tabor. Based on the — I'm sorry, Mr. Tebbets. Based on the Town regulations read at the beginning of our presentation defining a rooming and boarding house and based on the comparison chart shown previously, in your opinion, does it represent a fair assessment of what a rooming and boarding house is and how the Meyers properties are operated?
Tebbets: It appears to, yes.
Tabor: Thank you very much.
Hoffman: Mr. Tebbets, if you could just take a look at these two —
Stebbins: For the record, just reidentify yourself.
Hoffman: My name is Catherine Hoffman. If you could take a look at these two, one is the brochure for the Meyers property and the other one is a letter from Mr. Meyers to the residents that was dated March 16, 1995. In Mr. Meyers' letter, he states that there is 24-hour house supervision by a house mom. Is that correct?
Tebbets: Yes.
Hoffman: Since there are two locations to supervise and all the tenants are expected to work a regular 40-hour week, as also stated in Mr. Meyers' letter, in your opinion, is there a 24-hour supervision at these two properties? CT Page 6286
Tebbets: I think mathematically, that probably couldn't happen.
Hoffman: Did you consider that fact when you issued your May 22 ruling?
Tebbets: No, I did not.
Hoffman: Okay. Do you think you should have?
Tebbets: Yes.
Hoffman: Thank you.
Paul: Kristin Paul. Mr. Tebbets, in the Meyers' brochure advertising the two boarding and rooming houses, he highlights, residents' stay should be somewhere between four weeks to one year, one week's security deposit, completely furnished, private rooms, comfortable common areas, laundry facilities, cable TV and private yards, correct?
Tebbets: Yes it is.
Paul: In your opinion, is the Meyers' brochure advertising a rooming and boarding house?
Tebbets: It certainly sounds similar, yes.
Paul: Did you consider this when you issued your May 22, 1995 ruling?
Tebbets: No I did not.
Paul: Okay.
Rannenberg: Rosanne Rannenberg. After looking at the locations on the map of rooming and boarding houses within the Town of Groton, you can clearly see that they are not located in residential neighborhoods. In your opinion, is this a fair observation?
Tebbets: Yes. CT Page 6287
Rannenberg: Raul Court is located in an RS zone and a rooming and boarding house is not allowed, is that correct?
Tebbets: Yes.
Rannenberg: 25 Fenwick Court, although in an open space subdivision and according to permitted use 6.4-4, a rooming and boarding house is not allowed. Is that correct?
Tebbets: Yes.
Rannenberg: Did you consider these facts when you issued your May 22, 1995 ruling?
Tebbets: No I did not.
Rannenberg: Should you have considered these facts when you issued your ruling?
Tebbets: Yes.
Rannenberg: So it is perfectly clear in everyone's mind, what are the permitted land uses in these zones? What are the permitted land uses?
Tebbets: Single family dwellings.
Rannenberg: Thank you.
Transcript of July 12, 1995 Proceedings, pp. 8 — 11.
This testimony greatly and surely undermined Tebbetts' May 22, 1995 ruling that the Meyers' properties "comply with the Town of Groton Zoning Regulations." On its face, the May 22, 1995 ruling meant the properties complied with all the Town of Groton Zoning Regulations, including those about "boarding/rooming houses." At the July 12, 1995 ZBA hearing, Tebbetts admitted he had not considered several factors he should have considered. He cannot be faulted for not knowing the Fire Marshal considered the properties to be rooming houses; the Fire Marshal's letter is dated July 10, 1995. But, Tebbetts' testimony shows he had not even considered whether the Meyers' properties might be rooming houses. This is somewhat astounding in view of the fact that CT Page 6288 James Butler, Director of Planning, had focused on the "rooming house" issue as critical to the matter early on. Butler wrote:
 "If the transition homes are not businesses, is not the nature of their operation closer to a rooming and boarding house (as evidenced by individual contracts and the transitional nature of the residents) as opposed to a one-family dwelling? Can the short length of the residents' stay be used to exclude this use as being classified as a one-family dwelling?" Memorandum, James S. Butler, Director of Planning, to James F. Brennan, Town Attorney, March 17, 1995, p. 2. Return of Record Item # 7.
This memorandum indicates a copy of it was sent to Mr. Tebbets.
The factors established, but which Tebbetts had not considered, militate, and strongly so, towards a conclusion that the Meyers' houses were rooming houses.
The unchallenged evidence before the board is clear. Meyers, did not rent either premises as a whole to a group keeping house together. Rather, at each house there were multiple lettings by Meyers to several individuals; the letting to each individual was for a bedroom with the concomitant privilege to use common areas, e.g., hallways, bathroom, kitchen, and living room, etc. Each individual's length of stay varied. Each was relatively short term. And, this use of the houses generated income perhaps twice the going rate for the rental of comparable single family houses. These factors are entirely consistent with the use and operation of "rooming houses."
Plaintiff claims the defendant board refused to consider the evidence showing the houses were rented to a group and that group met the regulations' definition of a "family."
 "The ZBA ignored the provisions of their regulations and the factual circumstances presented to them in bowing to the panic of reactionary neighbors." Brief Of The Plaintiff Bruce Meyers, March 20, 1996, p. 5.
 ". . . the ZBA erroneously interpreted their Regulations." Id., 6.
"The ZBA failed, refused or neglected to consider CT Page 6289 whether the Properties were being used as single family dwellings, even though this was the basis for the ZEO's decision. If the ZBA refuses to consider whether a group of unrelated adults could qualify as a `family', [Sic] then there is no purpose for maintaining the provision within the Regulations, effectively, this renders portions of the definitions superfluous and contradictory." Id., 7.
If the board ignored the evidence that the Meyers' houses were used as single family houses, it didn't ignore much. There was little hard evidence before the board that even tended to show what plaintiff claims. And, the hard evidence showed facts antithetical to plaintiff's claims; it showed the houses were rooming houses, not a rental to a group keeping house together as a family.
Plaintiff claims the board ignored the provisions of the regulations which define the word, "family." That regulation is repeated here in full:
 "FAMILY: Any number of individuals related by blood, marriage, or adoption, living together as a single housekeeping unit. A group of not more than four persons keeping house together, but not necessarily related by blood or marriage, may also be considered a family." Zoning Regulations, Section 2 Definitions, p. 2-4.
The term, "keeping house together," is not defined in the regulations. Nor has the term been described in any other authority. But, from its place in the context of the entire regulation, it may fairly be read as meaning "keeping house together as or like a family."
Plaintiff ignores the reality. There was no evidence that either 25 Fenwick Court or 21 Raul Court was leased as a whole to a group entity made up of unrelated adults keeping house together. Rather the evidence, which comes from Meyers himself, was that he let rooms to various individuals whom he selected to live there.
Normally, a group keeping house together like a family would determine who would be in the family group. But that is not the case here. Meyers selected and determined who could stay at his CT Page 6290 houses, including the requirement that prospective lodgers grant [Meyers] access to confidential treatment records." It would be highly unusual for a family to permit a landlord to intrude into the privacy of family members' lives to the extent Meyers' demanded, i.e., giving him "access to confidential treatment records." The telephone at each of the houses was not listed in the name of the purported "family" group or any member of the group; the listings were in Meyers' name. Normally a group keeping house together like a family would determine how much each person in the group would pay towards the expenses of running the household, including rent. But here, Meyers determined how much each individual would pay for staying at the houses. Normally, a group renting a house as a whole would pay a monthly rent for the house; the amount of rent would not vary with the number of persons living in the house. But here, the amount Meyers received varied with the number of persons lodging at the house. Normally, a group keeping house together like a family would determine its own rules for its governance. But this is not the case here; each person lodging at Meyers' houses signed a contract with Meyers which bound that person to abide by Meyers' rules. If a house were rented to a group keeping house together like a family, the landlord could not place a "house supervisor" or "house mom" in the house. And, a group keeping house together like a family would not tolerate the intrusions of landlord's visits four times a week.
Thus, plaintiff efforts to portray his use and operation of the properties at 25 Fenwick Court and 21 Raul Court as being the same as and no different from a rental of a single family dwelling to a "family," even a group keeping house together, is not justified by the facts in evidence.
Dinan v. Board of Zoning Appeals, 220 Conn. 61 (1991), involved a "rooming house" versus "single family residence dispute." The owners claimed the zoning ordinance's "restriction of the term `family' to include only traditional families of related persons" violated the state constitution. Id., 68. In discussing whether the use of the property was consistent with "single family homes," the Supreme Court stated:
 "[T]he separate rental arrangements that the plaintiffs make with each tenant indicate a lack of cohesion within both five person groups that negates the claim that each group constitutes a family of five unrelated individuals. Even though common facilities are shared, CT Page 6291 and possibly even meals, there is no indication of any tie among the plaintiffs' tenants that is likely to outlast their separate occupancies of the premises." Dinan v. Board of Zoning Appeals, 220 Conn. 61, 73-4
(1991).
See also, Dimenstein v. Milford Zoning Board of Appeals,6 CSCR 843 (1991).
From the evidence before the board, "there [was] no indication of any tie among the plaintiffs' tenants that is likely to outlast their separate occupancies of the premises." There was little evidence the people housed at the Meyers houses were "keeping house together." The only evidence to that effect were Meyers' conclusory characterizations of same. The other evidence, again most of which emanated from Meyers, is inconsistent with and contradicts the normal concepts of a family or group "keeping house together." See pp. 28-31, above.
The scant evidence that the Meyers's houses were used by one family, that is, by a group "keeping house together," was not compelling. In view of all the other evidence, the board was justified in coming to the conclusion that the Meyers houses were not occupied by a group keeping house together.
Some mention of Oliver v. Zoning Commission of the Town ofChester, 31 Conn. Sup. 197 (1974), is in order. The Town Attorney and the plaintiff have relied on it, but for different propositions.
Citing Oliver, plaintiff says ". . . other Connecticut cases have found similar group homes to be keeping house together." Brief of the Plaintiff Bruce Meyers, March 20, 1996, p. 9. There is no resemblance between the situation in Oliver and the Meyers' operation. In Oliver, Sepowski, the owner of a large home and property sought approval to rent to the Connecticut Department of Mental Retardation. The department would use the property
 "`[t]o conduct a residence for retarded, employable persons, from approximately 16 years and up, under a State of Connecticut rehabilitation program for eight or nine persons who are presently housed at the Mansfield Training Center, to provide a place for the persons where they can function as members of the community under the supervision of house parents.'" CT Page 6292 Oliver v. Zoning Commission of the Town of Chester, 31 Conn. Sup. 197, 200 (1974).
The department would have "a specially trained married couple employed by the state to serve as houseparents" to provide "care and supervision." Id., 199. The court found the proposed use came within the Chester regulations' definition of single family use: "One or more persons occupying the premises as a single housekeeping unit. . . ." Nothing in Oliver aids plaintiff's claim that his occupants were keeping house together. In fact, Oliver states: "It is not the mutual relationship between the occupants of the dwelling, but its use `as a single housekeeping unit' that controls. . . ." Id., 205 That statement is the antithesis of what plaintiff claims here.
Plaintiff has not relied on Oliver as authority on the meaning of "rooming/boarding houses."
At a time well before the board's July 12, 1995 hearing, and without the benefit of all the evidence the board had, the Town Attorney concluded that the "Meyers Half-way Houses" were not "rooming houses." Relying on Oliver's holding that a "rooming house" "presupposes operation by the principal resident of the premises," Oliver, 204, it was the Town Attorney's view the Meyers' houses were not rooming houses because "neither the Meyers nor any `principal resident' operates them." Letter, James F. Brennan, Town Attorney, to James S. Butler, Planning Director, May 1, 1995, p. 3. Return of Record, Item 11. Without commenting on the overall efficacy of Oliver, the court disagrees with its being authority here.
The fact situation in Oliver is detailed above. At one point, Sepowski (the would-be lessor) contended the proposed use would warrant classification as a "rooming house," a permitted use. The court stated:
 "One contention is compliance with § 5.1.d, which permits `[t]he letting of rooms or furnishing board by the resident of the premises to not more than 8 persons.' Since there is no definition of the terms in this regulation, we must establish their legal meaning. Jeffery v. Planning Zoning Board, supra. A `lodging house' or `boarding house' means `any house or building or portion thereof, in which six or more persons are harbored, received or lodged for hire, or any building CT Page 6293 or part thereof, which is used as a sleeping place or lodging for SIX or more persons not members of the family residing therein.' General Statutes § 19-342. That the proposed community residence will not be a commercial lodging or boarding house is self-evident. The second definition, like § 5.1.d, presupposes operation by the principal resident of the premises, unlike the state's proposed operation and management of the Sepowski property. The planned group home does not, therefore, qualify as a rooming or boarding house within the permitted use for this zone." Oliver v. Zoning Commission, 31 Conn. Sup. 197, 204 (1974).
As the court recognized in Oliver, it was "self-evident" "the proposed community residence will not be a commercial lodging or boarding house." And, this was clear even though Sepowski was not going to be a resident. The statute cited, C.G.S. § 19-342, contained two definitions for lodging and boarding houses. "The second definition, like § 5.1.d [of the Chester zoning regulations], presupposes operation by the principal resident." Id. But the primary definition in that statute does not depend upon the operator's residing on the premises. The Chester zoning regulation, § 5.1.d, defined lodging and boarding houses as "[t]he letting of rooms or furnishing board by the resident of the premises. . . ." Unlike the Chester regulations, the "boarding/rooming house" definition in the Groton regulations does not make operation by a principal resident or owner a prerequisite for classifying a property as a "boarding/rooming house." The court rejects Oliver as authority for what is or is not a "rooming house" under the Groton zoning regulations.
As stated by the Supreme Court of the United States —
 "The regimes of boarding houses, fraternity houses, and the like present urban problems." Village of Belle Terre v. Boraas, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974).
The problems presented by "rooming/boarding houses" are not diminished by their being operated by an absentee owner; common sense and experience suggests those problems are magnified and others created by the operation of same by an absentee owner. No good reason appears, zoning-wise, for making the owner's residing on the premises a factor in the classification of a property as a "boarding/rooming house." The Groton Zoning regulations do not. CT Page 6294
The court finds and concludes the record contains sufficient evidence which supports, indeed demands, the conclusion made by the board that the "two houses fall under the definition of rooming/boarding houses, and that such use is not permitted in an RS zone (21 Raul Court), nor in an open space subdivision (25 Fenwick Court is in the Woodcrest Subdivision, an open space subdivision) in the RU-20 zone."
The second point the court must address is "whether they [the assigned grounds] are pertinent to the considerations which the authority was required to apply under the zoning regulations." See p. 8, above. The plaintiff has not made any claim on this aspect of the case. The court concludes that this aspect was satisfied.
Plaintiff makes some complaint that Tabor's appeal was improperly worded and the public notice was similarly misworded and inadequate. Brief of The Plaintiff Bruce Meyers, March 20, 1996, pp. 12-15. However, plaintiff's appeal does not identify inadequate public notice as a grounds for his appeal. Appeal From The Zoning Board of Appeals, August 2, 1995. This claim may not be properly before the court. Nevertheless, the court will address it.
There is little merit to this claim.
In her appeal to the Zoning Board of Appeals, Tabor requested the Board to "OVERTURN THE DECISION OF THE ZONING OFFICIAL THAT HAS ALLOWED GROUP HOMES/3/4 HOUSES/1/2 WAY HOUSES TO OPERATE IN A RESIDENTIAL ZONE." Application dated May 26, 1995. Record Item No. 1.
A public hearing by the Zoning Board of Appeals was scheduled for July 12, 1995. The public notice described the purpose of the hearing:
 "Theresa Tabor, applicant; to appeal a decision of the Zoning Official that allowed group homes/3/4 hours [Sic]/1/2 way houses to operate in a residential zone." Certificate of Legal Notice, Record Item No. 2.
The court finds it hard to see how this was misleading. The court does not know what a "1/2 way house" or a "3/4 house" is. But whatever a "3/4 house" is, Meyers himself advertised 21 CT Page 6295 Fenwick Court as a "3/4 house." See page 10, above. Brochure About Mr. Meyers [Transition House], Return of Record, Item No. 30(f). And, the town attorney's opinion letter which Meyers touts to criticize the board's decision is captioned: "Re: Meyers Half-way Houses." Letter, James F. Brennan, Town Attorney, to James S. Butler, Planning Director, May 1, 1995, Return of Record, Item 11. In his brief, plaintiff alludes to his houses as being "group homes." Brief of the Plaintiff Bruce Meyers, March 20, 1996, p. 9. [107]
Adequate notice of an agency's public hearing is a prerequisite to the validity of any action taken on the basis of that hearing. Regarding the "adequacy" of the public notice for a hearing of a zoning board of appeals, the Supreme Court has said:
 "It is adequate if it fairly and sufficiently apprises those who may be affected of the nature and character of the action proposed, so as to make possible intelligent preparation for participation in the hearing, if such action seems desirable." [Citations omitted.] Shrobar v. Jensen, 158 Conn. 202, 207 (1969).
Plaintiff knew the July 12, 1995 hearing was about the May 22, 1995 ruling stating his properties complied with the zoning regulations of the Town of Groton. Tabor's appeal and the public notice used the term, "3/4 houses." Meyers advertised his property as a "3/4 house." Plaintiff claims the zoning enforcement officer ruled that Meyers' properties were used as "single family dwellings." Meyers had to know the appeal challenged that conclusion.
Plaintiff states:
 "It is clear that this hearing was not intelligently prepared for. A review of the transcript will reveal that no one addressed the proper issue and the Board poorly apprised itself of the materials presented by its own Town Attorney and Planners. Where a legal notice is misleading the case must be remanded for renotice and hearing on the merits. The notice of this appeal was misleading and inapplicable to the basis of the ZEO's decision." Brief of The Plaintiff Bruce Meyers, March 20, 1996, p. 14.
This statement is not correct. Clearly, Tabor and her allies CT Page 6296 "intelligently prepared for" the hearing. Using Meyers' own statements, they convincingly showed the Meyers' properties were not rented to a single family, but were used and operated as rooming houses. According to plaintiff, the "proper issue" was whether the houses were being rented as a single family dwelling to a "family." In reaching its conclusion that the properties were "rooming houses," the board had to have decided each house was not rented to a single family. Plaintiff has offered nothing to support his claim that the "Board poorly apprised itself of the materials presented by its own Town Attorney and Planners." Even if defendant board's decision is at odds with earlier views of the town attorney and/or the planners, that does not mean the board did not adequately consider the materials those officials presented. The board correctly appraised the materials furnished it.
The plaintiff claims the notice of the public hearing was inadequate because it didn't contain any mention of "rooming houses." According to plaintiff, the basis of the zoning enforcement officer's decision was his conclusion the Meyers' houses were rented to a "family" as defined in the regulations. Assuming that was the basis of the ruling, the notice clearly showed the zoning enforcement officer's decision was being challenged because it permitted, among other things," 3/4 houses" in locales where only single family homes were allowed. The notice informed that Tabor sought to have the zoning enforcement officer's ruling overturned. If, as plaintiff claims, that decision was based on that officer's view that the Meyers' houses were rented as single family homes, it was notice that the issue before the hearing was whether the houses were being rented as single family homes. One way to show that the houses were not rented to a single family would be by showing they were "rooming houses." The notice was not deficient because it didn't say the houses were "rooming houses." The notice requirements do not have to be that specific.
 "`Notice of a hearing is not required to contain an accurate forecast of the precise action which will be taken upon the subject matter referred to in the notice.'" [Footnote omitted] Fuller, Land Use Law and Practice, § 46.3, p. 745.
See also, Shrobar v. Jensen, 158 Conn. 202, 207 (1969).
There is no doubt that plaintiff knew of the public hearing. CT Page 6297 He wrote to the board before the hearing advising he would not attend the hearing. Meyers' wife attended. He had an attorney representing him while the matter was being considered by the zoning enforcement officer. That same law firm represents him in this case. In his letter to the board, plaintiff invited the board "to contact my attorney." Plaintiff has not shown why he did not have that attorney represent him at the public hearing. And, plaintiff has not shown that the notice he claims was inadequate prevented him from being adequately prepared. He has not shown how the claimed notice deficiency caused his "not [being] intelligently prepared for" it. His July 2, 1995 letter to the board certainly indicates he knew the issue; he claims in that letter that his tenants live together as a family. By statute, the court may take evidence if it appears "that additional evidence is necessary for the equitable disposition of the appeal." See C.G.S. § 8-8 (k). If the plaintiff had evidence, argument, etc., which he did not present because he was. mislead by the notice, upon a showing to the court that he had in fact been mislead, that information could have been presented to the court during the court hearing. Plaintiff made no attempt to introduce any evidence to the court to the effect (1) that he had been mislead by the notice, or (2) that he had evidence or argument, etc., which he had not presented because he was mislead. The court must conclude that the public notice had not caused plaintiff's "not [being] intelligently prepared for" the hearing. He has not even suggested there was any evidence, argument, etc., he would or could have presented but had not because of his having inadequate notice of the public hearing.
The court concludes that the notice of the July 12, 1995 public hearing was adequate.
The plaintiff's claim(s) of improper notice of the public hearing is (are) denied.
Plaintiff also claims:
 "The ZBA refused to continue the matter so Meyers could be heard, even though they had prior knowledge he would be out of town and they were under no time constraints." Brief of The Plaintiff Bruce Meyers, March 20, 1996, p. 15.
According to plaintiff, this too "resulted in a deprivation of his due process rights." p. 15. CT Page 6298
Neither the record nor the law support this claim. The only evidence bearing on this issue is a letter from Meyers to the defendant board dated July 2, 1995. The pertinent part thereof states:
 "Due to prior commitments I am unable to be present at your July 12th meeting. I would be available in August should you wish to speak directly with me or you may contact my attorney Thomas Londregan of Mystic and New London." Letter, Bruce Meyers to Zoning Board of Appeals, July 2, 1995, Return of Record, Item # 21.
The court cannot view this as a request for a continuance. The board did not refuse a requested continuance. Plaintiff did not even say he wanted to be present but graciously said he'd be available in August if the board "wish[ed] to speak directly with [him]." Although the plaintiff alleges the board was "under no time constraints," plaintiff makes no reference to the record which would support his claim that there were no time constraints. What about the public, particularly those who had an interest in attending the hearing on the matter? Legal notice to the public had been given. Was the board required to continue the hearing with the inevitable inconvenience to the board and the public when the plaintiff did not ask for one? Was the board required to grant a continuance just because plaintiff had "prior commitments," the nature of which and their relative importance vis-a-vis the subject matter of the hearing were unknown to the board? The court answers these questions in the negative. Again, plaintiff has not even suggested there was any evidence, argument, etc., he would or could have presented to the hearing if the hearing were continued so he could be present. Again, the plaintiff made no attempt to present any evidence to the court on this issue at the court's hearing on the appeal. C.G.S. § 8-8
(f). The court knows of no authority that the board's not continuing the matter under these circumstances violates due process. The plaintiff has cited none. Admittedly having the benefit of hindsight, the court believes plaintiff treated the hearing in a somewhat cavalier manner. It is not the court's function to bail out the plaintiff when he chose not to attend to assert/protect his interests.
Plaintiff's claim that his due process rights were violated because the hearing was not re-scheduled is without merit. CT Page 6299
Plaintiff claims the board's action constitutes (1) a deprivation of the Plaintiffs' use of the Property without due process of law, (2) "a confiscation of the Plaintiffs' Property without just compensation," and (3) "a taking of the Plaintiffs' Property without just compensation." Appeal From The Groton Zoning Board of Appeals, August 2, 1995, ¶ 7(c), p. 3. Plaintiff's Brief did not flesh out these claims.
No evidence regarding any diminution of the value of the Meyers' properties was presented to the defendant zoning board of appeals or the court. "The record establishes without question that the plaintiffs made no attempt to prove a taking." Under the circumstances, the court cannot find a confiscation or taking or otherwise resolve this claim. Bombero v. Planning ZoningCommission, 218 Conn. 737, 746 (1991).
Somewhat adamantly, plaintiff claims the defendant board did not consider or discuss whether the Meyers' houses were used as single family dwellings.
 "The ZBA failed, refused or neglected to consider whether the Properties were being used as single family dwellings, even though this was the basis of the ZEO's decision." Brief, 7.
 "There is no finding by the Board that the Properties are not occupied as a `family'. [Sic] In fact, the ZBA did not even address this issue. There is absolutely no evidence on the record which contradicted the ZEO's determination that the occupants of the Meyers' Properties were `keeping house together' as required by the Regulations. . . . The Board did not have any discussion about the Properties with respect to their qualifications under the single family dwelling regulation. Notwithstanding this fact, the decision specifically `overturns' the ZEO's decision. This provides clear evidence that decision is arbitrary and should be overturned by the Court," Brief, 10.
There is no specific finding by the defendant board stating that the Meyers' properties are not occupied by a family. It is implicit in the finding that the houses were "rooming houses." But plaintiffs' other assertions just quoted are not supported by the record. The record contains the July 12, 1995 minutes and the transcript of the public hearing on the Meyers' matter. The CT Page 6300 minutes show the public hearing on the Meyers' matter began at 8:55 p. m. and was closed at 10:20 p. m. The transcript of the public hearing shows that at the close of the public hearing, the Chairman said "the Board will take this up in special session." The minutes contain entries under the heading, "Meeting Following Public Hearings." Under the matter titled "#95-15 — 25 Fenwick Court and 21 Raul Court (Meyers/Tabor)," the minutes state:
"The Chair requested discussion from each Board member.
"MOTION: To uphold the decision of the Zoning Official.
 "Motion made by T. Manning, seconded by R. Fitzgerald. Motion did not carry, 0 votes in favor, 5 opposed. DECISION OVERTURNED, because testimony presented indicates the two houses fall under the definition of rooming/boarding houses, and that such use is not permitted in an RS zone (21 Raul Court), nor in an open space subdivision (25 Fenwick Court is in the Woodcrest Subdivision, an open space subdivision) in the RU-20 zone." Minutes of Meeting held on July 12, 1995, p. unnumbered p. 4. Record Item No. 5.
There is no record whatsoever before the court as to what was said or not said by board members when the chairman invited discussion or at any other time. It must be surmised the board members discussed and considered whether the properties were "rooming/boarding houses." That follows from the recorded board finding that the "testimony presented indicates the two houses fall under the definition of rooming/boarding houses." There is no record the board discussed whether the Meyers houses were used. as single family residences or as rooming houses. That is because the record does not include a transcript or other account of any discussions which may have taken place. If it is significant — the court cannot see any significance — that the board members did not discuss, as plaintiff asserts, anything about the houses vis-a-vis the single family use regulation, it was incumbent upon plaintiff to bring evidence of that claimed failure before the court. He did not. The court cannot, and will not, presume any failing or wrongdoing by the board for this unsupported allegation. Furthermore, plaintiff was the source of the compelling, uncontradicted evidence that each house was let to several individuals who paid plaintiff a weekly amount based on the room the individual occupied. This is the direct opposite of a rental of property by an owner to a "family," whether the CT Page 6301 "family" be a traditional one or group keeping house together.
The record does not support the claim the board did not discuss or consider whether the Meyers' houses were rented as single-family residences.
Plaintiff also asserts:
 "The facts will reveal that the ZBA had improper motives and treated the Plaintiff unfairly with respect to all other single family dwellings occupied by unrelated tenants. The ZBA had every intent to discriminate against the plaintiff because the Properties are housing for recovering alcoholics and drug addicts." Brief, 6-7.
This napalm toss is totally unwarranted. It trashes the board and its members; it demeans the plaintiff and the whole process. The plaintiff's charges that the board acted "with improper motives" and "had every intent to discriminate against the plaintiff" are serious and go to vitals of the process and our tradition of volunteer citizen participation in government. Simply translated, plaintiff charges the defendant board deliberately acted in bad faith. There is no evidence in the entire record to support that claim. Such evidence, if there were any, would be "necessary for the equitable disposition of the appeal." See C.G.S. § 8-8 (k). Plaintiff made no attempt to support this scurrilous accusation. In the absence of supporting, evidence, such statements should not be in a brief even under the guise of zealous advocacy. Members of a zoning board of appeals are public officers. "There is a presumption that a public officer properly performs his duty unless the contrary appears."Cahill v. Board of Education, 198 Conn. 229, 242 (1985). In the court's mind, the proper performance of duty includes acting with proper motive, and without the intent to discriminate, i.e., acting in good faith. The court concludes that the defendant board acted in good faith when it found the plaintiff's houses were rooming houses.
In this appeal, the plaintiff also claims the defendant board's
 "decision was made in violation of the federal Fair Housing Act as codified in 42 U.S.C. § 3602, et seq., in that the Defendant Board's interpretation of the CT Page 6302 Regulations effectively discriminates against handicapped persons in that it denies the residents of the Property an equal opportunity to enjoy a dwelling." Appeal, unnumbered pp. 2-3.
For several reasons, this claim is not properly before the court.
The authority of a zoning board of appeals is limited. That authority is defined by statute.
 "Sec. 8-6. Powers and duties of board of appeals. (a) The zoning board of appeals shall have the following powers and duties: (1) To hear and decide appeals where it is alleged that there is an error in any order, requirement or decision made by the official charged with the enforcement of this chapter or any bylaw, ordinance or regulation adopted under the provisions of this chapter; (2) to hear and decide all matters including special exceptions and special exemptions under section 8-2g upon which it is required to pass by the specific terms of the zoning bylaw, ordinance or regulation; and (3) to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and intent and with due consideration for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of such bylaws, ordinances or regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety and welfare secured, provided that the zoning regulations may specify the extent to which uses shall not be permitted by variance in districts in which such uses are not otherwise allowed. No such board shall be required to hear any application for the same variance or substantially the same variance for a period of six months after a decision by the board or by a court on an earlier such application." C.G.S. § 8-6 (a).
As a creation of statute, the zoning board of appeals has only that power and authority given it by statute. The statutes CT Page 6303 creating and empowering zoning boards of appeal give them limited, specific powers. The Connecticut statutes do not give zoning boards of appeal the power to entertain or decide matters arising under the Fair Housing Act.
The Fair Housing Act does permit a private cause of action.
§ 3613. Enforcement by private persons
 (a) Civil action. (1)(a) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice. . . ." 42 U.S.C. § 3613.
Whatever else the Town of Groton zoning board of appeals may or may not be, it is not "an appropriate . . . State court."
At the court hearing on this appeal, plaintiff's counsel stated she had no authority that the zoning board of appeals had the authority, power or jurisdiction to decide Fair Housing Act issues. Transcript of Court Proceedings, 12/5/96, p. 14.
The defendant board did not have jurisdiction or authority to decide Fair Housing Act claims.
Similarly, this court in the context of an appeal from a decision of the zoning board of appeals pursuant to C.G.S. §8-8 is limited. It does not have authority to decide Fair Housing Act Claims.
At the court hearing on this appeal, plaintiff's counsel said she would inform the court of authority which authorized the court in the context of this appeal to decide issues which the zoning board of appeals could not decide. Transcript of Court Proceedings, 12/5/96, p. 15. No such authority has been presented.
The record before the defendant board does not show that any claim now presented to this court regarding the Fair Housing Act was presented to the defendant board. Plaintiff claims that Mrs. Meyers made such a request at the July 12, 1995 hearing. Transcript of Court Proceedings, 12/5/1996, pp. 15-16. Mrs. Meyers did address the board briefly. Included in her statement is the following: CT Page 6304
 "I believe, to speak in favor of Mr. Tebbets ruling, that he based it upon quite a lengthy brief from the Groton town lawyer, as well as supporting evidence from the Supreme Court." Transcript of ZBA Proceedings, 7/12/1995, p 27.
Mrs. Meyers' references were to the May 1, 1995 letter from James F. Brennan, Town Attorney, to James Butler, Planning Director, "Re: Meyers Half-way Houses," and the decision of the United Supreme Court in City of Edmonds v. Oxford House, Inc.,et, al., ___ U.S. ___, 115 S.Ct. 1776 (1995). Mr. Brennan did discuss the Fair Housing Act in that letter. And, the record contains a copy of the decision of the Supreme Court of United States in City of Edmonds v. Oxford House, Inc., et al. decision. How Mrs. Meyers' statement, Attorney Brennan's letter, and/or City of Edmonds v. Oxford House, Inc., et al., amount to a statement of the claim under the Fair Housing Act now being asserted in this court eludes the court.
In this court, just over two pages of plaintiff's 18-page brief are devoted to the Fair Housing Act. Brief of the Plaintiff Bruce Meyers, March 20, 1996, pp. 15-17. [107] The court cannot tell from this material just what plaintiff's claims are regarding how the Fair Housing Act should be applied here. Plaintiff does state:
 "If Groton permits the single family use by other groups who are not struggling with handicaps, (i.e. college students, or navy personnel) they are acting in a discriminatory manner, which is made illegal by the FHA, and the decision, and the decision should be overturned." Brief of the Plaintiff Bruce Meyers, March 20, 1996, pp. 15-17. [107]
At the court hearing on this appeal, plaintiff's counsel stated plaintiff was making a "disparate impact" claim under the Fair Housing Act. Transcript of Court Proceedings, 12/5/96, pp. 17 — 19. Counsel elaborated:
 "I believe that the Meyers could show disparate impact in the record by proof that they have five or six unrelated adults living in a house. And in this case, the zoning board has chosen to apply boarding-house definition instead of the single family use CT Page 6305 definition." Id., 17.
 "I believe this is a disparate impact case. I believe they are applying different standards to people who have handicaps than people who don't." Id., 18.
 "I am asking them to apply the same regs they apply to five law students who live together as they do to five alcoholics who live together." Id., 18-19.
Counsel made it clear plaintiff wasn't asking for an exception to the "rooming/boarding house" regulation.
 THE COURT: Well, aren't you really asking for them to make an exception from the rooming-house prohibition?
MS. DRISCOLL: Absolutely not.
Now having this limited handle on what plaintiff's Fair Housing Act claim is, the court looks to the board record to see if it can be fairly said the claim was made to the board. According to plaintiff, mention at the board hearing of the Town Attorney's letter and the Supreme Court's decision in City ofEdmonds v. Oxford House, Inc., et al., both of which were in the board record, was sufficient notice to the board of plaintiff's claim. The court has examined both to determine whether either alone or in tandem gave notice of plaintiff's claim.
In his letter to the Planning Director dated May 1, 1995, well before the zoning enforcement officer's decision, the Town Attorney did discuss the Fair Housing Act and its possible implications to the zoning scheme in Groton, but he was not and could not be specific. He did not mention "disparate impact" at all and certainly not in the context of the Meyers' houses. His letter concluded:
 "In summary, I have concluded that the present use of both Meyers properties does not violate our zoning regulations for single family homes. It was therefore not necessary for me to consider application of the Fair Housing Act to the issues. However, in reaching my conclusion I was certainly influenced by the possibility that any attempt to declare the Meyers house illegal could very well trigger a challenge based on the provisions of the Act as interpreted by the CT Page 6306 courts. Until the supreme court decides the Edmonds
case, any attempt to enact new legislation (zoning or otherwise) would be ill-advised." [Footnote omitted.] Letter, James F. Brennan, Town Attorney, to James S. Butler, Planning Director, May 1, 1995, p. 6. Return of Record, Item 11.
There is nothing in the Town Attorney's letter which can be interpreted as notice of a disparate impact claim under the Fair Housing Act. This is not surprising given that it was written well before the decision of the zoning enforcement officer which was the subject of the appeal to the board.
Mention of the City of Edmonds v. Oxford House, Inc., et al.
decision and the presence of a copy of it in the board record does not flag the disparate impact claim. That case was not about a claim of disparate impact. Its scope was very limited and no issue in it coincides with anything in this case. The case did involve the Fair Housing Act but only a very narrow facet thereof.
Oxford House ran a group home where 10-12 unrelated adults who were recovering substance abusers were housed. The City of Edmonds zoning code contained a provision "governing areas zoned for single-family dwelling units" and it "defines `family' as `persons [without regard to number] related by genetics, adoption or marriage, or a group of five or fewer [unrelated] persons." 115 S.CT. @ 1778-9. The city threatened criminal action against Oxford House. Oxford House countered with a suit seeking protection under the Fair Housing Act. The city responeded claiming its code limitation on the number of unrelated persons permitted in a single family house was exempt under the Fair Housing Act's provision which "entirely exempts from the FHA's compass `any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.' 42 U.S.C. § 3607 (b)(1)." 115 S.CT. @ 1778.
The issue before the court was specific.
 "The sole question before the Court is whether Edmonds' family composition rule qualifies as a "restrictio[n] regarding the maximum number of occupants permitted to occupy a dwelling" within the meaning of the FHA's absolute exemption. 42 U.S.C. § 3607
(b)(1)." [Footnote omitted.] 115 S.CT. @ 1780. CT Page 6307
The Supreme Court decided:
 "The parties have presented, and we have decided, only a threshold question: Edmonds' zoning code provision describing who may compose a "family" is not a maximum occupancy restriction exempt from the FHA under § 3607(b)(1)." City of Edmonds v. Oxford House, Inc., et al., 115 S.CT. 1776, 1783.
Nothing in City of Edmonds would, could or should have alerted the defendant board that Meyers, as of July 12, 1995, was making the "disparate impact" claim now fashioned in this court.
Since the "disparate impact" claim is the only Fair Housing Act claim plaintiff says was made to the defendant board, the court holds plaintiff did not make any claim under the Fair Housing Act to the zoning board of appeals on or before July 12, 1995.
Since no Fair Housing Act claim was made before or to the zoning board of appeals, can the court in this appeal decide the Fair Housing Act claim(s)? Our Connecticut Supreme Court has indicated that claims not presented and decided by an agency should not be grounds for a court's overturning the agency's decision in an administrative appeal.
 "To allow a court to set aside an agency's determination `upon a ground not theretofore presented deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action.' Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136; see Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 158, 80 S.Ct. 1392, 4 L.Ed.2d 1623." Hartford Electric Light Co. v. Water Resources Commission, 162 Conn. 89, 107 (1971).
See also, Burnham v. Administrator, Unemployment CompensationAct, et al., 184 Conn. 317, 323 (1981); and, Valley ViewConvalescent Home v. Commission on Hospitals and Health,32 Conn. Sup. 300, 302 (1975).
The court has held (1) the defendant zoning board of appeals did not have authority or jurisdiction to hear and decide Fair CT Page 6308 Housing Act matters, and (2) also that this court cannot do so in an appeal from the zoning board of appeals. And, the court has held plaintiff did not even present a Fair Housing Act claim to the defendant board. The court for this reason too cannot decide the Fair Housing Act claim.
As an aside, the court reviewed the record with an eye towards the plaintiff' Fair Housing Act "disparate impact" claim. In the court's view, the record is woefully deficient for the establishment of such a cause.
For example, plaintiff argues —
 "If Groton permits the single family use by other groups who are not struggling with handicaps, (i.e. college students, or navy personnel) they are acting in a discriminatory manner, which is made illegal by the FHA, and the decision should be overturned." Brief of the Plaintiff Bruce Meyers, March 20, 1996, pp. 15-17. [107]
By the use of the prefatory, "if," plaintiff pinpoints a fundamental weakness in this claim. There is no evidence that Groton permits the letting of rooms to individuals as Meyers does in areas zoned single-family residential by non-handicapped students or navy personnel. Such evidence as there was on the topic was to the effect that "rooming/boarding houses" were not in areas zoned single-family residential. See, e.g., Comparison Chart Between Meyers' Properties and Rooming and Boarding Houses, Return of Record Item No. 30(b); Transcript of ZBA Proceedings, 7/12/95, pp. 9 — 11. Thus, the premise for that Fair Housing Act claim is not established in the record.
The bigger picture here includes claim and/or issue preclusion, i.e., res judicata and/or collateral estoppel. The lack of authority or jurisdiction of the board and this court probably inures to plaintiff's benefit. If either the board or the court had the authority to decide the Fair Housing Act claims, the plaintiff could not prevail because the record developed before the board and the court does not make a fair run at demonstrating a violation of the Act. For example, plaintiff is not a handicapped person; does his position as one who lets rooms to those purportedly handicapped make him an "aggrieved person" under the Fair Housing Act? He may be since the Fair Housing Act purports to grant standing as broad as is permitted CT Page 6309 by Article III of the Constitution of the United States. The record does not even contain the names of those residing at the Meyers' houses. There is no hard evidence that any one of them is in fact "handicapped person" under the Act. They may well be but the evidence before the board does not establish they are. These are some of many evidentiary shortcomings. The record, in the court's view, does not establish the requisite facts for a cause of action under, or claim of violation of, the federal Fair Housing Act.
The court believes it has addressed and decided all the issues raised by the appeal as required by § 334A of the Rules of Practice.
The appeal is dismissed.
Parker, J.